NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals
# for the District of Columbia Circuit

---❖---

## Nos. 22-1332 and 23-1023

---❖---

NCRNC, LLC, d/b/a Northeast Center for
Rehabilitation and Brain Injury,

*Petitioner,*

*v.*

NATIONAL RELATIONS BOARD,

*Respondent.*

---

1199SEIU UNITED HEALTHCARE WORKERS EAST,

*Intervenor for Respondent.*

*On Petition for Review from the National Labor Relations Board
in No. NLRB-03-CA-252090.*

# FINAL BRIEF FOR PETITIONER

Dawn J. Lanouette
James S. Gleason
Hinman, Howard and Kattell, LLP
80 Exchange Street
P.O. Box 5250
Binghamton, New York 13902
Tel.: (607) 723-5341
Fax: (607) 723-6605
jgleason@hhk.com
dlanouette@hhk.com

*Counsel for Petitioner*

July 3, 2023

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

### A. Parties and Amici

The Petitioner is NCRNC, LLC d/b/a Northeast Center for Rehabilitation and Brain Injury ("Northeast Center").  NCRNC does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

The Respondent is the National Labor Relations Board ("NLRB" or "Board"), an agency of the United States.

1199 SEIU Healthcare Workers East, a union, is an intervenor.

Petitioner is not aware of any amici.

### B. Rulings Under Review

The Ruling Under Review is the Decision of the National Labor Relations Board issued on December 16, 2022 in the case captioned: *NCRNC, LLC d/b/a Northeast Center for Rehabilitation and Brain Injury and 1199 SEIU United Healthcare Workers East and Tara Golden*, Cases 03–CA–252090, 03–CA–254186, and 03– CA–255155; 372 NLRB. No. 35 (Dec. 16, 2022).

### C. Related Cases

This case has not been on review in this or any other court previously. Petitioner is not aware of any related cases.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW,
AND RELATED CASES PURSUANT TO CIRCUIT
RULE 28(a)(1)..................................................................................i

TABLE OF AUTHORITIES ................................................................v

GLOSSARY OF TERMS .................................................................. viii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES ..................................................................2

STATEMENT OF THE CASE ..............................................................6

    Procedural History ..........................................................................6

    Northeast Center ............................................................................7

    CSS Department .............................................................................8

    Response to a Comment About Unions............................................8

    Union Campaign ...........................................................................10

SUMMARY OF THE ARGUMENT ...................................................10

ARGUMENT ....................................................................................12

    STANDARD OF REVIEW .............................................................12

    POINT I

    NORTHEAST CENTER DID NOT ENGAGE IN UNLAWFUL
    SURVEILLANCE .........................................................................13

        Legal Standard.........................................................................13

        Relevant Facts .........................................................................14

            Management Meetings .........................................................14

            Unit Managers Supervised their Units on All Shifts............................15

            Manager on Duty Program (MOD)....................................15

            The Board's Decision .........................................................17

The MOD Program Was Not Surveillance ........................................18

The Instruction to Managers Regarding the Fliers Was Not
Surveillance ..........................................................................20

GC-11 Does Not Support an Inference of Unlawful
Surveillance ..........................................................................21

The Surveillance Claim Should Be Dismissed as a Violation
of Due Process.........................................................................22

POINT II

GOLDEN WAS TERMINATED FOR FAILING TO BE A
MANAGER .........................................................................23

Legal Standard.......................................................................23

Relevant Facts ......................................................................24

Golden Was Terminated for Poor Management ................................26

POINT III

JOSHUA ENDY WAS A STATUTORY SUPERVISOR ...........................27

Relevant Facts ......................................................................27

Josh Endy Exercised Judgment in Assigning Work ..........................28

Discipline.............................................................................32

Responsibly Direct ................................................................33

Other Indicia of Supervisory Status ...........................................34

POINT IV

ENDY WAS NOT UNLAWFULLY INTERROGATED OR
THREATENED AS HE WAS A STATUTORY SUPERVISOR ...............35

POINT V

ENDY WOULD HAVE BEEN TERMINATED EVEN WITHOUT
HIS ALLEGED PROTECTED ACTIVITY .....................................35

Legal Standard.......................................................................36

Endy Was Terminated for Insubordination, Workplace
Violence and Property Damage...................................................36

POINT VI

CATHY TODD WAS SUSPENDED AND TERMINATED
FOR ABUSIVE BEHAVIOR TOWARD PATIENTS .................................37

    Relevant Facts ......................................................................37

    Todd Had Training on Avoiding Mistreatment of Patients ...............38

    Todd Knew Her Medication Administration Obligations...................38

    Todd Was Counseled for Her Treatment of Patients .........................39

    A CNA Complaint about Todd's Behavior Toward Patients .............40

    The Facility Initial Investigation Before Suspending Todd...............40

    Todd's Interview and Suspension Pending Further
    Investigation ........................................................................41

    Interviews of Patients Confirmed Multiple Incidents of
    Mistreatment........................................................................42

    Other Incidents of Patient Mistreatment by Todd Came to
    Light ...................................................................................43

    Staff interviews Confirmed Todd's Mistreatment of Patients ...........44

    Pope Learned of Medication Problems Caused by Todd...................44

    Termination .........................................................................44

    Misapplication of *Wright Line* ...............................................45

    Todd Was Terminated for Her Mistreatment of Patients...................48

CONCLUSION .......................................................................48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aladdin Gaming*,
    345 NLRB 585 (2005) ...................................................................18

*Auburn Sr. Service Center*,
    2016 NLRB Reg. Dir. Dec. LEXIS 114 (2016) .........................................30

*Beth Israel v. NLRB*,
    437 U.S. 483 (1978)...................................................................19

*Broadway*,
    267 NLRB 385 (1983) ................................................................14

*Dover Energy, Inc. v. NLRB*,
    818 F.3d 725 (D.C. Cir. 2016).....................................................12

*Drug Plastics & Glass Co. v. NLRB*,
    44 F.3d 1017 (D.C. Cir. 1995).................................................. 22-23

*Eddyleon Chocolate Co.*,
    301 NLRB 887 (1991) ................................................................14

*Florida Builders*,
    111 NLRB 786 (1955) ................................................................20

*FORMCO, Inc.*,
    245 NLRB 127 (1979) ................................................................34

*General Motors, LLC*,
    2020 NLRB LEXIS 378 ..............................................................37

*GM LLC*,
    369 NLRB No. 127 (July 21, 2020) ..........................................36

*Greenbrier Rail Servs.*,
    2014 NLRB LEXIS 534 172 (2014) .........................................13

*Humana of W. Virginia, Inc.*,
    265 NLRB 1056 (1982)..............................................................35

*Jack Holland & Son, Inc.*,
    237 NLRB 263 (1978) ................................................................33

v

*Matheson Fast Freight, Inc.*,
297 NLRB 63 (1989) ...................................................................................33

*MECO Corp. v. NLRB*,
986 F.2d 1434 (D.C. Cir. 1993) ............................................................ 45, 47

*Mondelez Global, LLC*,
369 NLRB No. 46 (2020) ............................................................................36

*NLRB v. Baptist Hospital, Inc.*,
442 U.S. 773 (1979) .....................................................................................19

*NLRB v. Jones & Laughlin Steel, Co*,
301 U.S. 1 (1937) .........................................................................................18

*Oakwood Healthcare, Inc.*,
348 NLRB 686 (2006) ............................................ 27, 28, 29, 30, 31, 32, 33

*Peoples Gas Sys., Inc. v. NLRB*,
629 F.2d 35 (D.C. Cir. 1980) .......................................................................13

*Purolator Prods.*,
270 NLRB 694 (1984) .................................................... 20, 21, 22, 24, 27, 35

*Robertshaw Controls Co.*,
263 NLRB 958 (September 9, 1982) ............................................................34

*Sprain Brook Manor Nursing Home, LLC*,
351 NLRB 1190 (2007) ...............................................................................19

*Synergy Gas Corp. v. NLRB*,
19 F.3d 649 (D.C. Cir. 1994) ................................................................ 12, 13

*The Dalton School*,
364 NLRB No. 18 (2016) .............................................................................22

*Tschiggfrie Properties, Ltd.*,
368 NLRB No. 120 (2019) ...........................................................................36

*Wal-Mart Stores, Inc. & United Food and Commer. Workers Int'l Union*,
340 NLRB 1216 (2003) ...............................................................................14

*Western Sample Book and Printing Co., Inc.*,
209 NLRB 384 (1974) ..................................................... 20, 24, 26, 27, 35

*World Evangelism, Inc.*,
261 NLRB 609 (1982) ..................................................................................35

**Statutes and Other Authorities:**

29 U.S.C. § 160(b) ..................................................................................1

29 U.S.C. § 160(f).................................................................................1

National Labor Relations Act § 7 ..............................................13, 36, 37

National Labor Relations Act § 2(11).......................................................4

National Labor Relations Act § 8(a)(1) ..........................2, 3, 5, 10, 11

National Labor Relations Act § 8(a)(3) ............................3, 5, 11, 35

National Labor Relations Act § 8(c)...............................2, 11, 20

National Labor Relations Act § 10 .........................................................1

## GLOSSARY OF TERMS

| | |
|---|---|
| NLRB or Board | National Labor Relations Board |
| NLRA or Act | National Labor Relations Act |
| ALJ | Administrative Law Judge |
| CSS[1] | Community Support Specialists (a classification of employees) |
| NBI[2] | Neuro Behavioral Unit—a locked down unit for patients who are a danger to themselves or others |

[1] Throughout the testimony, documentary evidence and in the Decisions, they are referred to as CSS.  As such, the abbreviation is used in this brief for consistency with the Record and Decisions on Appeal and to avoid confusion.

[2] Throughout the testimony, documentary evidence and in the Decisions, the Neuro Behavioral Unit is called NBI.  As such, the abbreviation is used in this brief for consistency with the Record and Decisions on Appeal and to avoid confusion.

## JURISDICTIONAL STATEMENT

The NLRB had jurisdiction over the charged unfair labor practices pursuant to Section 10 of the National Labor Relations Act.  29 U.S.C. Section 160(b). Petitioner/Appellant Northeast Center is an employer within the meaning of the National Labor Relations Act. The NLRB did not have jurisdiction over the uncharged conduct as set out in Point I of the Brief.

This Court has jurisdiction over the appeal of the NLRB's final decision and order pursuant to 29 U.S.C. Section 160(f), which provides for jurisdiction over any petition for review of a final order of the Board in the D.C. Circuit Court of Appeals.

The Decision and Order of the NLRB was issued on December 16, 2022. The Petition for Review was filed on December 27, 2022.   The appeal is from a final order or judgment that disposes of all parties' claims.

## STATEMENT OF ISSUES

1.      Did the Board err in finding Northeast Center directed statutory supervisors to surveille employees during a union campaign in violation of 8(a)(1) of the Act when the instruction allegedly given was to

    a.  Walk through patient work areas on work time looking for suspicious activities, anybody gathering groups and activity that was not job related; and

    b.   To pass out fliers protected under 8(c) of the Act and do no more than report employees' body language, their eye contact, their response to handouts.

2.      Does the Board's holding that Northeast Center directed statutory supervisors to surveille employees when it directed statutory supervisors to provide employees its campaign literature and talking points and observe their reactions to the literature violate Northeast Center's 8(c) right to express its views on unionization.

3.      Did the Board err in finding the employer engaged in unlawful surveillance when there was no such charge in the underlying complaint and it violated Northeast Center's due process rights to be found responsible for uncharged conduct that Northeast Center had no opportunity to present evidence about or refute.

2

4.    Did the Board err in finding the employer engaged in unlawful surveillance when the substantial evidence demonstrated that:

    a.  Northeast Center began the manager engagement program before the employer was aware of the union campaign;

    b.  Northeast Center required managers to keep their eyes and ears open; and

    c.  The undisputed evidence is that no surveillance actually occurred.

5.    Did the Board err in holding that Tara Golden, a statutory supervisor, was improperly discharged for refusing to commit an unfair labor practice in violation of 8(a)(3) and 8(a)(1) of the Act despite substantial evidence that:

    a.  Golden was responsible for her unit 24 hours a day 7 days a week and was "requested" to be present on her unit during times other than 9-5 as part of her duties;

    b.  Golden was "requested" to provide employees lawful campaign literature as part of the Employer's anti-union campaign and report only employees' body language, their eye contact, their response to handouts;

    c.  Golden was asked to observe whether employees were doing their jobs during work hours;

3

    d.  Golden was lawfully suspended for suspected union support including continuing to interrogate employees after she was directed to stop committing an unfair labor practice by asking employees about their union sympathy; and

    e.  Golden was discharged because she continued to struggle as a manager, commit unfair labor practices and refused to cooperate with and was critical of the Employer's union response campaign.

6.    Did the Board err in holding that Josh Endy, a Community Support Specialist Supervisor (CSS Supervisor) was not a statutory supervisor under section 2(11) of the Act despite evidence that

    a.  Endy and other CSS Supervisors made assignments of CSS employees to jobs with varying responsibilities and varying degree of difficulty in the facility during their shift using their discretion and judgment considering a number of factors including experience, abilities, relationship with patients, and patient need;

    b.  Endy and other CSS Supervisors were responsible for handling first step discipline and were involved with other discipline; and

    c.  Endy and other CSS Supervisors directed work for employees and were held accountable for employee performance.

7.    Did the Board err in holding that Endy, a CSS supervisor, was improperly threatened and interrogated regarding his union activity despite substantial evidence he was a statutory supervisor.

8.    Did the Board err in holding that Endy was improperly discharged for his union activity despite substantial evidence he was discharged for insubordination, workplace violence and property damage.

9.    Did the Board err in its application of the *Wright Line* standard to the discharge of Cathy Todd when it failed to consider the lack of evidence showing union animus and the considerable evidence of patient mistreatment by Todd.

10.    Did the Board err in holding that Cathy Todd was improperly discharged in violation of 8(a)(3) and 8(a)(1) despite substantial evidence showing:

a.  The complaint of patient mistreatment came from a non-management employee;

b.  A new Director of Nursing became aware of prior reported issues with Todd from both supervisory and non-supervisory employees;

c.  Prior to termination Northeast Center conducted an investigation regarding those reported issues; and

d.  Other nurses were terminated for similar behavior.

5

## STATEMENT OF THE CASE

**Procedural History**

General Counsel brought this complaint against Northeast Center alleging it committed various unfair labor practices, and unlawfully discharged three individuals (Tara Golden, Josh Endy, and Cathy Todd).  A384.

Following a hearing, Administrative Law Judge Ira Sandron issued a Decision dismissing some unfair labor practices and finding against Northeast Center on others, including all three discharges. The ALJ also found Northeast Center committed the uncharged conduct of surveilling employees. A33, 47. On review, the NLRB affirmed in part and modified the decision in part.

Relevant here, the Board affirmed the determination that Cathy Todd was terminated for her union activity.  In a 2-1 decision, the Board affirmed the decision that Golden was terminated for refusing to engage in illegal surveillance and the decision that Endy was not a statutory supervisor and was terminated for protected union activity.  The Board (2-1) also modified and affirmed the decision finding Northeast Center engaged in uncharged surveillance.

Northeast Center now appeals the Decision regarding the uncharged surveillance, and the Decision regarding the terminations of Golden, Endy and Todd. Northeast withdraws its appeal in all other respects.

6

**Northeast Center**

Northeast Center is a specialty rehabilitation and long-term care center focused on individuals with traumatic brain injuries. The patients, known at the facility as "Neighbors",[3] suffer from cognitive impairment. That is, they have problems with attention, mood regulation and impulse control, processing information, and self-awareness and judgment. A216. Because of their brain injuries, patients sometimes engage in "behaviors" such as throwing things, physical and verbal aggression, or acting out in inappropriate ways. A56.

Patients at Northeast Center live in "Units." The Neuro Behavioral Unit (NBI) is a 20-bed behavioral locked unit. Patients on NBI are a danger to themselves or others. Services, such as therapy and activities, come to the patients on NBI, as the patients do not leave NBI. A54-55; 218; 242.

Other Units include the Ventilator Unit, the Medically Complex Unit, and the Neuro-Rehabilitative Program. Patients often remain in the facility for a very long time or even permanently. A54; 218.

Each Unit is overseen by a Unit Manager. Each Unit is staffed with nursing department staff (Certified Nurses Aids, Licensed Practice Nurses, etc.) who report

---

[3] For clarity, Respondent has referred to them as "patients" or "residents" in this memorandum of law. In documentation and testimony, they are typically referred to as "Neighbors."

7

to their respective Unit Manager. A218. Northeast outsources dietary and housekeeping services to other companies. A217; 219.

### CSS Department

In addition to the nursing staff, Northeast Center has 46 Community Support Services Specialists ("CSS"). These employees work throughout the building, on every unit and in common areas. Their role is to provide safety and security for the patients and staff. A241; 289. CSS redirect patients away from negative behaviors, check on patients with behavioral concerns, sign patients in and out of the building, and ensure safety for patients and staff. A289.

### Response to a Comment About Unions

Patrick Weir became the Administrator for the Northeast Center on February 20, 2019, and in the position, had overall responsibility for the building. A220.

On July 5, 2019, a Unit Manager reported she overhead employees at the nurses' station comment about a union. As a result of this report, in late July, Northeast Center engaged consultants to provide labor relations consulting, management evaluation and training to management employees. A221-23; 346; 403-06.

8

Keith Periano (consultant) stayed approximately five (5) days at Northeast Center in July 2019. A361.[4]  He met with unit managers, the directors of departments, human resources, and the Administrator. A348. Periano's team met one-on-one with management employees and evaluated their communication. Periano's team also walked around the building, talked to employees, and observed management employees at work. A353; 225.

The management evaluations revealed there was a lack of trust in the Director of Nursing and ineffectiveness on the part of the Director of Human Resources, both of whom were later terminated. A225; 353. Periano recommended that managers be more present on all shifts, as employees on the evening and weekend shifts complained they had little to no contact with the management of the facility. A226; 354.

As a result, in August 2019, Weir implemented a Manager on Duty Program requiring department heads to rotate coming in during different shifts and times to walk through the building to get to know employees and be visible. A226. Unit Managers, who were responsible for their Unit 24/7 (A265; 266), were also asked to continue to be present on evening, night and weekend shifts. A226.

---

[4] The Board Decision states the consultant came back periodically to Northeast between July and October.  A7.  This is not accurate and there is no support for this statement in the record.

9

In the Fall of 2019, Northeast Center was short staffed, and management employees were encouraged to pitch in and help employees when they could. A227; 355.

**Union Campaign**

The Union filed a Petition for Election on October 15, 2019. A224; 978. The Union withdrew the Petition, and the withdrawal was approved on October 31, 2019. A979. The consultants returned to the facility on October 28, 2019, and stayed at the facility through November 2019. They remained in touch with the facility until January 2020. A362; 366.

## SUMMARY OF THE ARGUMENT

Northeast Center did not engage in unlawful surveillance in violation of 8(a)(1) of the National Labor Relations Act (Act). Unit Managers and Department Heads were instructed only walk through work areas where patients lived in the long term care facility to watch for suspicious activity, people gathering in groups and not working on work time. Unit Managers already had the responsibility to come in on all shifts to supervise employees. Department Heads were rotated through supervising the building through a management improvement program that began before the union petition was filed. As a long term care facility, Northeast Center had a legitimate reason to supervise patient care areas for the comfort and

10

well-being of their patients.  Further, an employer does not violate the act by observing public activity in its workplace.

Northeast Center did not commit surveillance in violation of 8(a)(1) of the Act by asking supervisors to pass out fliers containing factual statements to employees and report back employee reaction during and after the conversation. The employer's actions were protected under 8(c) of the Act.  The employee reactions were readily observable, and the instruction was given to Golden after she had already asked employees how they felt about the union as a way for her to avoid interrogation.

Northeast Center did not terminate statutory supervisor Tara Golden in violation of 8(a)(3) of the Act. Golden, a statutory supervisor, was terminated because she failed to make the transition to a management employee both in her work and in her response to the employer's union response campaign, and not because she refused an illegal instruction regarding surveillance of employees.

Joshua Endy, a CSS Supervisor, was a statutory supervisor because he assigned work to employees by making judgments, comparing skills, report with patients, patient care needs and other factors.  Alternatively, he was a statutory supervisor because he disciplined employees and he responsibly directed employees.

11

As a statutory supervisor, Endy was not illegally interrogated or threatened regarding his union activity.  Further, Endy was terminated for insubordination, workplace violence and property damage, and not for union activity.

Cathy Todd was terminated for patient mistreatment.  The evidence that Todd supported the union is minimal and not sufficient to find union animus.  The evidence that Todd mistreated patients, including swearing at them, forcing them to sit in a chair, withholding food and medications, and not allowing them to make phone calls to family was overwhelming.

## ARGUMENT

## STANDARD OF REVIEW

The Court reviews the legal conclusions of the Board *de novo.  See Dover Energy, Inc. v NLRB*, 818 F3d 725, 729 [D.C. Cir. 2016].  The Court reviews the Board's factual findings to determine if they are supported by substantial evidence. *See Id. citing Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C. Cir. 1994). This review "'must take into account whatever in the record fairly detracts from the weight' of the evidence cited by the Board to support its conclusions," *Id., quoting Synergy Gas Corp.*, 19 F.3d at 651 (internal citations omitted).  In making this review, the Court "does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its

reasoning," *Id. quoting Synergy Gas* Corp, 19 F.3d at 651, quoting *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C. Cir. 1980).

## POINT I

## NORTHEAST CENTER DID NOT ENGAGE IN UNLAWFUL SURVEILLANCE

Northeast Center was not charged with unlawful surveillance in the charges or complaint.  *See* A380, 382, 384. After dismissing the unlawful interrogation and impression of surveillance claims, the ALJ found uncharged surveillance to justify his decision that supervisor Tara Golden was unlawfully terminated for refusing an illegal instruction.  The Board modified this Decision, finding Northeast engaged in unlawful surveillance by its Manager on Duty program and by the passing out of fliers to union employees.  As the Dissent explains, neither of these activities are unlawful surveillance as a matter of law.  Further, substantial evidence does not support the Board's conclusion.

### Legal Standard

"[T]he test for determining whether an employer engages in unlawful surveillance or whether it creates the impression of surveillance is an objective one and involves the determination of whether the employer's conduct, under the circumstances, was such as would tend to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed under Section 7 of the Act." *Greenbrier Rail Servs.*, 2014 NLRB LEXIS 534, *170-172 (2014),

13

citing *Broadway*, 267 NLRB 385, 400 (1983).  "[M]anagement officials may

observe public union activity without violating the Act so long as those officials do

not 'do something out of the ordinary'" and coercive.  *Wal-Mart Stores, Inc. &*

*United Food and Commer. Workers Int'l Union*, 340 NLRB 1216, 1220 (2003),

citing *Eddyleon Chocolate Co.*, 301 NLRB 887, 888 (1991).

The Board found the presence of Department Heads and Unit Managers in

the facility during the evening and night shifts was outside the ordinary.  The

record demonstrates otherwise.

### Relevant Facts

### Management Meetings

From October 28 until Thanksgiving, the consultants held twice daily

management meetings four days a week for Unit Managers and Department Heads

(collectively "managers").  During the morning meeting, managers were given a

flier with the fact of the day-typically a quote from the NLRB's Guide to the

National Labor Relations Act with commentary or other similar statement.

Managers were asked to share the fliers with their employees.  In afternoon

meetings, managers were asked to report how the fliers had been received, what

they were hearing in the facility, whether they had any concerns, and whether

employees had raised any questions or concerns.  A352; 358.  During each

meeting, the consultants also reviewed what supervisors could and could not do during a union campaign.  A359.

Tara Golden was a Unit Manager.  Golden first attended a management meeting on October 28, 2019.  Golden contends that during the meeting, managers were "requested" to come in on their "off" hours and walk around the units looking for suspicious activities; anybody gathering in groups; and look for activity that was not job related. A85; 111.

### Unit Managers Supervised their Units on All Shifts

Since Unit Managers had 24/7 responsibility for their Units, Unit Managers made a practice of coming in some times on the evening, night and weekend shifts to see their employees. This practice pre-dated any union activity. A265, 266. Union witness Kim Leonard admitted that her Unit Manager sometimes came in during evening, weekend, and night shifts before there was talk of a union coming to the facility.  She acknowledged that she knew her Unit Manager was in charge of the Unit on every shift. A133.

### Manager on Duty Program

Increased supervisor presence was also caused by the Manager on Duty program implemented by Weir in August 2019. As early as July, when Northeast had no knowledge of any union activity, Weir advised that he and the administrative staff had already been coming in every shift throughout the week to

meet with employees and be present at the facility. A227; 403 ("I have also been to every unit on all shifts numerous times . . ."). Business Manager Julie Cole testified she had been coming in on different shifts and walking the hallways to check on employees for years prior to the Union's campaign.  A227, 375, 403.

In August 2019, at the recommendation of the management consultants, Weir started the Manager on Duty Program. A department head or other manager came in on every shift to walk around the building in order to better supervise the building and provide more contact between management and employees working night and evening shifts.[5] A226.

Golden testified that even prior to the union activity that the supervisors of every department in the facility came on her floor "every day, every shift." A106-07.[6]  She could not name a single person she saw come through her unit who did not have a reason to be there (A112-13).[7]  Leonard only identified the non-

---

[5] The Board seems to suggest this program began in October.  The only evidence in the record is that this program began in early August 2019.

[6] NBI was a locked unit.  Instead of patients going to activities, therapy and other departments, these services were brought to the patients on the unit. A54-55; 242.

[7] Golden finally admitted she didn't observe anyone on her floor who shouldn't be, "other people" "told" her it happened.  A106-07; 112-13.

employee Head of Housekeeping and the Head of Dietary as individuals who first came on her floor after union activity.[8]

Golden also testified that she was individually instructed she was "no longer allowed to state what I thought about the employees, like if I thought they were for the union or not for the union." Instead she was supposed to report body language and eye contact. A90.[9]

Golden indicated that after this instruction, she shared a flier with Simon Naccarato, a program specialist and reported back that afternoon. A90-91. Mr. Naccarato was neither a member of management nor eligible for the petitioned for unit. A108; 978.

**The Board's Decision**

The Board found the Manager on Duty program was illegal surveillance because managers and Department Heads came in on their "off" hours to supervise employees, and this was out of the ordinary activity.[10] The Decision is legally incorrect and not supported by substantial evidence.

---

[8] Maintenance and Respiratory were responsible for the entire building. Dietary and Housekeeping were outsourced departments. A217.

[9] There is no evidence anyone other than Golden was given this instruction.

[10] The Board concedes the place of supervision-namely the Units where patients lived, was not out of the ordinary.

**The Manager on Duty Program Was Not Surveillance**

As an initial matter, asking Unit Managers to come in and supervise their Units could not be surveillance because this practice existed prior to the Union. Further, the Manager on Duty program was not unlawful as it was within the facility's protected right to improve the management of its business by requesting Unit Managers and Department Heads supervise their employees on all three shifts. *See* A20, *citing NLRB v. Jones & Laughlin Steel Co*, 301 U.S. 1, 45-46 (1937) (Board majority opinion "interfere(s) with an employer's right to operate its business, including by changing how it manages and supervisor employees.").

Further, the Manager on Duty program was not unlawful because it was not "coercive" in any way. In *Aladdin Gaming*, the Board held "indicia of coerciveness include the duration of the observation, the employer's distance from its employees while observing them, and whether the employer engaged in other coercive behavior during the observation." 345 NLRB 585, 586 (2005). Per Golden, the only instruction given was to walk through the patient work areas of the facility to see if employees were engaged in non-job related activities and if they needed help with anything. A84-85. *Compare* A20 fn. 9 (citing cases).

The Board held the program was coercive because the managers were there to uncover evidence of union support, but there is no evidence in the record to support this contention.

18

Critically, Northeast Center is a healthcare setting, where patients live. As the Supreme Court has explained, "In the context of health-care facilities, the importance of the employer's interest in protecting patients from disturbance cannot be gainsaid." *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 787 (1979), quoting *Beth Israel v. NLRB*, 437 U.S. 483, 505 (1978).  Periano testified managers were to make sure that people were where they were supposed to be during work time.  A350-51.  He told managers that employees could gather in groups and talk in the break room or parking lot (A351), and that they could have conversations at the nurses station, just not on work time in patient care areas (A367).  Instructing supervisors to ensure employees were doing what they were supposed to be doing on work time in patient areas was a lawful directive to ensure patient care in a healthcare setting.

*Sprain Brook Manor Nursing Home, LLC*, 351 NLRB 1190 (2007), relied on by the Board majority is distinguishable. In *Sprain Brook*, the executive stood near a door to a private conference room to intentionally observe a union meeting. No Northeast Center supervisor was instructed to observe union activity and no supervisor did observe any union activity. Golden's testimony did not mention looking for union activity as part of the instruction; but rather looking for people being where they should not be on the Units, or engaged in non-work activity in patient areas.

19

Even if, however, management employees were instructed to look for union activity, "[t]here [is] nothing unlawful about the Respondent requiring its supervisor to watch for union activity in the workplace and report what they observed." Dissent, 279, citing *Florida Builders*, 111 NLRB 786, 787 (1955). In fact,

> merely requiring supervisors to report what they see and hear in the normal course of their day, even though the supervisors detest being "finks" and informers, and discharging the supervisors for failure to be adequate "finks" in the employer's estimation, is not illegal. *Western Sample Book and Printing Co., Inc.*, 209 NLRB 384, 390 (1974). The unsavory connotation of "fink" aside, the fact is that an employer has a legitimate interest in learning what his supervisors know, for the law imputes their knowledge to him.

*Purolator Prods.*, 270 NLRB. 694, 740 (1984).

### **The Instruction to Managers Regarding the Fliers Was Not Surveillance**

The Board's finding that Northeast Center surveilled employees when managers passed out legal fliers and observed employee reactions fairs no better. Section 8(c) of the Act prohibits using employer communication such as fliers as evidence against an employer of an unfair labor practice. Instead, it is protected activity so long as "such expression contains no threat of reprisal or force or promise of benefit." *See* A21 (citing cases). There is no claim the fliers contained any threats or promises.

Further, the instruction to Golden that she hand out the fact of the day flier and report back body language is not an instruction to engage in illegal

20

surveillance, but an instruction to keep her eyes and ears open.  *See Purolator Products*, 270 NLRB at 740.

Finally, the instruction to Golden did not happen in a vacuum. Golden testified the instruction given to her, individually, by Dave Camerota was that she was not to report what she thought about who was for and not for the Union. A90. This happened after Golden admitted to the consultant that she had been asking employees whether they were for or against the union and asking them why they wanted the union. A357-58. The instruction to Golden was not to engage in an unfair labor practice, it was to stop engaging in interrogation.

If passing out fliers and observing employee reactions is surveillance, then an employer cannot engage in any union response campaign because, as the Dissent notes, any document handed to an employee will cause a reaction.  A21. This determination by the Board is a violation of an employer's right to express its views and must be overturned.

### GC- 11 Does Not Support an Inference of Unlawful Surveillance

There was no testimony concerning GC-11. A407. Instead, the Board speculates that the email, sent only between Administrator Weir and the Management Consultants on November 11, 2019, after the union withdrew its petition, referencing "any statements from managers that the 1199 is still here for the lawyer" in an agenda related to pay raises at Northeast Center meant that "the

only way managers would have been able to learn this conduct would have been by questioning employees or surveilling them." A33; 407.  This finding completely ignores that surveillance does not include managers "report[ing] what they see and hear in the normal course of their day." *Purolator Prods.*, 270 NLRB at 740.  The email is a facility trying to determine what knowledge was imputed to the employer by their supervisors and whether the employer could make pay raises in light of potential union activity. A407.   It was not communicated to any supervisors and does not give any instruction to surveille employees.

### <u>The Surveillance Claim Should Be Dismissed as a Violation of Due Process</u>

Alternatively, the surveillance charge should be dismissed for due process reasons.  There was no charge of surveillance and no allegation in the complaint, or any amended complaint.  The dismissed charge that Northeast Center gave the impression of unlawful surveillance arose from a single incident involving a conversation between Nurse Kelly Leonard and the Director of Maintenance, not from the Manager on Duty program or the fliers.  Where an allegation is "not contained in either the charge or the Complaint" and "was not fully litigated at the hearing" such a finding violates due process. *See, e.g., The Dalton School*, 364 NLRB No. 18, slip op. at 2 (2016).  Northeast had no opportunity to present a full defense of this claim, and the claim should be dismissed.  *See also Drug Plastics &*

22

*Glass Co. v NLRB*, 44 F3d 1017 (D.C. Cir. 1995) (finding Board lacked

jurisdiction to prosecute claim not contained in the charges and not related to the

claims in the charges).

## POINT II

### GOLDEN WAS TERMINATED FOR FAILING TO BE A MANAGER

Golden was not terminated because she refused an unlawful directive

because the direction given to Golden was not unlawful. First, by Golden's

testimony there was no instruction at all, but a request to come in to supervise

patient areas on off-hours.  Second, Golden was a Unit Manager whose job

responsibilities included 24/7 supervision of her unit.  Any instruction to Golden or

other Unit Managers to come in on all shifts to interact with employees was

consistent with the requirement of the Unit Manager job and the practice of the

Unit Managers as it existed before any union activity.  A265, 266, 133.

Even if, however, the request for supervisors to supervise employees were

somehow unlawful, the Decision that she was terminated for failing to follow that

direction is not supported by substantial evidence.

### Legal Standard

[T]here has been established a class of employees, meeting the
statutory definition of supervisors, who can be brow beaten, harassed,
threatened, and discharged for failure to prevent the unionization of
the establishment where they are employed, or, as in the instant case,
if the employer concludes that such supervisors have exerted

23

insufficient energy in discovering information concerning the union
and thereby failed to assist the employer's antiunion campaign.

*Purolator Prods*, 270 N.L.R.B. at 738, quoting *Western Sample,* 209 NLRB at 390.

### Relevant Facts

As set out above, Golden was a Unit Manager and statutory supervisor.
Golden admitted that she struggled in her position as Unit Manager on NBI. A110;
243. Staff had complaints about Golden both before (A243, 245) and during the
union campaign (A246; 248; 255). Golden testified she was at her wit's end as a
manager. A619; 110.

Golden's difficulty with the manager role was compounded by her outright
hostility to the facility's union response campaign. After her first managers
meeting on October 28, Golden was required to meet individually with the
consultants because an email with her name had been sent to CSS workers
threatening to terminate them for union activity. Golden was ultimately suspended
pending investigation. The Board dismissed the claim that Golden was unlawfully
suspended, finding her suspension was lawful because Northeast Center believed
she, as a supervisor, was supporting the union campaign.

At her first meeting after return from suspension, Golden met individually
with executive Camerota who told her she was

no longer allowed to state what I thought about the employees, like, if
I thought they were for the Union or not for the Union. I was now
supposed to report body language, whether or not they made eye

24

contact with me; whether they stayed with me while we talked . . .
whether or not they crumpled literature up after we were over, and if
they spoke to anyone else after we spoke about the literature.

A90.  Periano testified this direction was given to Golden because despite being

repeatedly told she could not ask employees about their opinion of the union or

why they wanted a union, Golden asked employees questions about the union

again and again. A249; 304; 360; 365; 376. Her behavior convinced the union

consultant that Golden was intentionally trying to draw an unfair labor practice to

aid the Union. A360; s*ee also* A250; 360; 365. He recommended she no longer

attend the management meetings. A360.  No one told Golden she needed to come

in on her "off" hours.

Golden was absent from management meetings for a period of time, and

then attended another meeting on November 11. A92; 360. At that meeting,

Golden stood up and began arguing with the consultant. A92; 96. After the

meeting, Golden complained to business manager Julie Cole that the union

response campaign was a "witch hunt" and creating "hostility." A92.

Golden testified after November 11, she no longer participated in the union

response campaign. A96. Notably, Golden was not terminated for refusing to come

in on her "off hours" despite not doing so.

Two weeks later, at a management meeting, Golden again began stating who

was for and against the union. A249; 360; 365. Following this meeting, executive

Mary Pat Carhart met with Golden privately. Carhart began by asking what Golden had to say. Golden testified she "exploded", raised her voice and was loud. She called the union response campaign a "witch hunt"; said it was "ridiculous" and "there was hostility in the building." A69. Carhart raised concern that Golden had been reported to be passing out union cards. A69-70. Golden denied the claim.

Golden claims during this meeting she "re-iterated" she would not be willing to come in on her off time to prove she was not a union organizer, Carhart did not raise with Golden her alleged refusal to come in on her off time. Carhart's response was to tell Golden not to call the union response campaign a "witch hunt." A101.

### **Golden Was Terminated for Poor Management**

As the Board Dissent explains:

> what the record demonstrates is that it was Golden's overall unwillingness to fully support the Respondent's antiunion campaign as a supervisor, as well as the Respondent's reasonable belief that Golden actually supported the Union, that were the reasons for the discharge. Respondent was entitled to discharge Golden for these reasons.

Board Dissent 17, citing *Western Sample Book and Printing Co, Inc.* 209 NLRB 384, 390 (1974). As Weir stated-Golden was terminated because she was not acting like a management employee. A250; 621.

The substantial evidence demonstrates it was Golden's unwillingness to fulfill her responsibilities as a manager both in her job and in support of the Employer's lawful union response campaign that led to her termination. There is

26

no evidence anyone at Northeast Center considered Golden's alleged refusal to come in on her "off time" as a reason to terminate her. Golden was no longer a good fit for the facility because she could not or would not grasp her role as a supervisor during a union campaign and her behavior put the facility at risk of an unfair labor practice charge.

As a supervisor, Golden's management failures, her failure to support the Facility's union response campaign, her activity in support of the union, and her repeated refusal to stop interrogating employees, are legitimate reasons for her termination. *See Purolator Prods*, 270 NLRB at 739-740; *See also* A23 citing *Purolator Products, supra; Western Sample Book*, 209 NLRB at 389.

## POINT III

## JOSHUA ENDY WAS A STATUTORY SUPERVISOR

> [I]ndividuals are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 supervisory functions (e.g., 'assign' and 'responsibly to direct') listed in Section 2(11); (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment; and (3) their authority is held in the interest of the employer.

*Oakwood Healthcare, Inc.*, 348 NLRB 686, 687 (2006) (internal quotations omitted).

### **Relevant Facts**

Josh Endy was a CSS Supervisor on the night shift. After receiving numerous complaints about Endy pushing employees he supervised to sign cards

on work time, Periano scheduled a meeting with Endy.  A356. Endy admits Periano started the meeting by asking if he was a supervisor—to which Endy responded that he was. A210; 297. Periano then continued by explaining to Endy that as a supervisor he could not pass out union cards.  Endy admitted he was not suspended or discharged during the meeting. A178.

Instead, during the meeting, Endy became aggressive, threw his badge at his supervisor, and said I don't need this fucking job.  He slammed the door so hard it broke the garbage can behind the door, put a hole in the wall, and broke the door frame.  A298; 549; 557.  After this outburst, his supervisor followed Endy out of the room and terminated him in the hallway. A298.

### **Josh Endy Exercised Judgment in Assigning Work**

The Board found that CSS Supervisors (including Endy) independently assigned work; however, the Board majority found they did not exercise "judgment" in doing so, and as such, were not statutory supervisors. As the Dissent explains, this holding was contrary to existing Board law and is not supported by substantial evidence.

"If there is only one obvious and self-evident choice . . . or if the assignment is made solely on the basis of equalizing workloads, then the assignment is routine or clerical in nature and does not implicate independent judgment." *Oakwood Healthcare,* 348 NLRB at 693. But if "[t]he [] assignments determine what will be

28

the required work for an employee during the shift, thereby having a material

effect on the employee's terms and conditions of employment", the supervisor has

exercised judgment in making the assignment. As the Board held in *Oakwood*

*Healthcare*:

> In the health care context, choosing among the available staff
> frequently requires a meaningful exercise of discretion. . . . A charge
> nurse's analysis of an available nurse's skill set and level of
> proficiency at performing certain tasks, and her application of that
> analysis in matching that nurse to the condition and needs of a
> particular patient" involves judgment.

*Id.* at 695.

The CSS supervisors scheduled employees to positions included individual

supervisions, close visual observation, the front desk, and the NBI Unit.[11]  A166;

183; 327. In making these assignments, the CSS supervisor considered the needs of

patients as set out in their care plan, and employee skill and ability in meeting

those particular needs such as the ability to build report with a difficult patient, the

ability to de-escalate a patient prone to outbursts, or the ability to distract a hyper

patient from obsessive or negative behaviors. A186-87.

The Board majority attempts to distinguish *Oakwood Healthcare* on the

basis that the CSS workers did not receive specialized training and could do any

job; however, specialized training was only one factor mentioned in *Oakwood*, and

---

[11] Individual Supervisions are referred to in the record as IS.  Close Visual
Observations are referred to in the record as CVO.

presumably all of the nurses could perform nursing duties. In *Oakwood*, the Board focused on the charge nurses' assessment of "patients' conditions and needs, the nursing personnel's ability, and other factors they deemed relevant depending on their unit"; factors identical to those considered by the CSS supervisor. *Id.* at 697; A185 (skill at bonding with patients, learning and avoiding patient triggers; de-escalating a patient).

The Board in *Oakwood* held the Charge Nurses exercised judgment when they considered the "personalities and compatibility of staff members" to particular tasks and the "quantity of work to be assigned, the relative difficulty of the work involved, and the competence of the staff available to do the work" as well as whether and how to assign work to themselves. *Id.* at 697. CSS Supervisors also considered who could meet the patient needs, whether staff had the skill to perform particular job duties, the difficulty of assignments, and assessed how best to assign themselves to work during a particular night. A186; 331.

The Charge Nurses considered "the patient's condition, continuity of care, gender and personality of the staff and patients." *Id.* at 696. Similarly, CSS Supervisors considered putting staff with patients who trusted them and avoiding putting staff and patients who had conflicts together, the patient's care plan, and the gender and personality of staff and patients. A186-87; 328; 331; *see also Auburn Sr. Service Center,* 2016 NLRB. Reg. Dir. Dec. LEXIS 114, *24-25 (2016)

30

(Finding supervisory status where Nurse Manager assigned based on staff personality and skill set; patient level of care, personality, and other factors.).

The Charge Nurses in *Oakwood* had to "reassess[] patient care assignments during a shift because of personality clashes between a patient and a nurse", and they were required to "exercise discretion in deciding how to allocate the resources available for the shift." *Id.* at 697. CSS Supervisors, likewise, had to make adjustments throughout the night, and had to allocate resources available.  A333.

Of particular relevance to this case, in making assignments to a mental health unit, the charge nurses in *Oakwood* exercised discretion in considering "the aggressiveness of the patient and a care giver's ability to respond to the same." These are the same factors considered by the CSS supervisors at Northeast Center in assigning employees to the NBI Unit. *Compare Id.* at 696 to A185-86.  There is no reason why experience and skill in de-escalating patients matters for nurses but not for CSS workers; or why considering the personality and report with patients was an exercise in judgment for charge nurses but not for CSS Supervisors.[12]

Finally, while it should not be determinative, it is not accurate that CSS Supervisors did not consider specialized training in making assignments. They considered assigning people who had the training to respond to Codes, to

---

[12] As the Dissent notes, there is far less judgment used in assigning the one dialysis nurse to a dialysis patient than there is in assigning one of three potential CSS workers to a patient with special needs.  A25-26.

Therapeutic Support or close visual observation. A189-90; 330. They assigned

people to the front desk who had training on and could use the phone and computer

system. A188; 329.

The Board also states there were no "wrong" assignments; however, the

testimony was clear that the assignments did affect the employee's terms of work

for the night (A331 some jobs are "a little bit rougher"; A224 NBI "gets to you")

and that making the right assignments was necessary for having a pleasant night.

A303. While on a perfect night it took only fifteen (15) minutes to fill out the

assignment sheet, most nights it took approximately a half hour to make these

assignments because of everything the Supervisors had to consider.  A332-33.

The CSS employees were not interchangeable widgets.  As the dissent points

out, CSS tried having assignments made solely on a rotating basis, but the facility

returned to having the CSS Supervisors use their judgment to make assignments

based on what would work best on a particular night. A169.  CSS Supervisors

exercised judgment because they were "balancing [ ] several factors occur and no

one factor dictates the staff selections made by the charge nurse." *Id.* at 697.

### **Discipline**

CSS Supervisors had the authority to discipline CSS employees. A291.

Substantial evidence showed CSS Supervisors could issue write-ups or education,

and did participate in suspension and termination. A198, 201, 293-94; 337; 539;

885. This is sufficient for supervisory status.  *See Jack Holland & Son, Inc*., 237 NLRB 263, 265 (1978); *Matheson Fast Freight, Inc*., 297 NLRB. 63, 71 (1989).

### **Responsibly Direct**

Responsibly Direct means "[T]he employer delegated to the putative supervisor the authority to direct the work and the authority to take corrective action, if necessary, [and] there is a prospect of adverse consequences for the putative supervisor if he/she does not take these steps." *Oakwood Healthcare*, 348 NLRB at 691-692.

The CSS supervisor checked on employees throughout the shift to make sure they were doing what they were supposed to be doing and recorded these checks on the daily shift report. A205; 206; 891. They handled problems that arose during the shift, made mid-shift adjustments, and managed breaks. A209; 214; 333-34. They had discretion to enforce facility rules (A207-09), and wrote employees up for infractions (A198, 201, 294, 337; 549; 885).

While holding that Endy directed employees; the Board found he was not a supervisor because there were no consequences for CSS Supervisors who did not do their job well. This conclusion is not supported by substantial evidence. Endy's supervisor, Marcus DeAbreau issued counseling to CSS Supervisors about their employees not taking breaks, not clocking breaks, and about employees not filling in appropriate documentation. A295; 342; 884. DeAbreau also issued a negative

review for Endy on his decision making as a supervisor. A884. The Board simply

ignored this alternate basis for supervisory status. Substantial evidence does not

support the Board's conclusion.

### **Other Indicia of Supervisory Status**

The Board did not consider other indicia of supervisory status, but they also

indicate Endy was a supervisor. The ratio of employees to supervisors supports a

finding that Endy was a supervisor. *See Robertshaw Controls Co.*, 263 NLRB. 958,

971 (September 9, 1982) (finding ratio of 1 supervisor to 15 employees more likely

than 1 to 35 employees); *FORMCO, Inc*., 245 NLRB. 127, 128 (1979) ("If, as the

Hearing Officer found, the foremen are not supervisors . . . the employee-to-

supervisor ratio would be 30 to 1 and perhaps 70 to 1, a ratio which the Board has

found to be disproportionate."). There were 46 employees in the CSS Department.

One Director could not supervise 46 employees across three shifts on his own. In

addition, the only other supervisor on night shift was the nursing supervisor.

CSS Supervisors could approve overtime without anyone's permission.

A290. Each night, CSS Supervisors filled out the shift-to-shift report which

provides information to the on-coming supervisor and the Quality Assurance Daily

Shift Report which recorded information on orders, breaks, codes and

documentation of CSS employees. A166-67; 169; 197; 204-05; 796; 891.  CSS

Supervisors were trained to and did respond to Codes in the Building. A181-82.

CSS Supervisors attended supervisor meetings and were paid a higher rate. A211-12; 882; 548.

## POINT IV

### ENDY WAS NOT UNLAWFULLY INTERROGATED OR THREATENED AS HE WAS A STATUTORY SUPERVISOR

Because he was a supervisor, any "interrogation" or "discipline" of Endy because he was passing out union cards was not an unfair labor practice.  *See Purolator Prods*, 270 NLRB at 738, quoting *Western Sample*, 209 NLRB at 390. In particular, "the discharge of supervisors as a result of <u>their</u> participating in union activities is not unlawful." *Humana of W. Virginia, Inc.*, 265 NLRB 1056, 1060 (1982); *World Evangelism, Inc.*, 261 NLRB 609, 609 (1982).

## POINT V

### ENDY WOULD HAVE BEEN TERMINATED EVEN WITHOUT HIS ALLEGED PROTECTED ACTIVITY

While acknowledging that 8(a)(3) termination and suspensions are governed by the *Wright Line* standard, the Board took the position that Endy's termination fell outside of the *Wright Line* cases.  This conclusion was incorrect and the finding that Endy was terminated for union activity is not supported by substantial evidence.

**Legal Standard**

Under *Wright Line*, the General Counsel must initially show that (1)
the employee engaged in Section 7 activity, (2) the employer knew of
that activity, and (3) the employer had animus against the Section
7 activity, which must be proven with evidence sufficient to establish
a causal relationship between the discipline and the Section
7 activity. *Tschiggfrie Properties, Ltd.*, 368 N.L.R.B. No. 120, slip op.
at 6, 8 (2019); see also *Mondelez Global, LLC*, 369 N.L.R.B. No. 46,
slip op. at 1-2 (2020).

*See GM LLC*, 369 N.L.R.B. No. 127 at 40 (July 21, 2020). If the General Counsel

meets that burden, "the employer will be found to have violated the Act unless it

meets its defense burden to prove that it would have taken the same action even in

the absence of the Section 7 activity." *Id. (*internal citation omitted). The Board

Decision is not supported by substantial evidence as Endy was terminated for his

behavior toward his supervisor and property damage separate from anything

related to the union.

**Endy Was Terminated for Insubordination, Workplace Violence and
Property Damage**

DeAbreau made the decision to terminate because of Endy's aggressive

actions, insubordination, and disrespectful manner toward him and because of the

property damage he caused. A299; 558. Other employees were also terminated for

insubordination and property damage even in the absence of union activity. A299;

886.

In *General Motors, LLC*, the Board recognized that Section 7 activity is separable from abusive conduct that may cause an employer to discipline an employee.  2020 N.L.R.B. LEXIS 378 at 38. The Board recognized an employer has the right to maintain "order and respect" in its workplace. *Id.* at 42. Northeast sought to address complaints made by employees with Endy. It had no plan to terminated him; only to educate him. Instead, Endy swore at his supervisor and damaged property. His supervisor terminated him as a result.

**POINT VI**

**CATHY TODD WAS SUSPENDED AND TERMINATED FOR ABUSIVE BEHAVIOR TOWARD PATIENTS**

The Board, overruling the ALJ, held that *Wright* Line applied to the termination of Cathy Todd.  In doing so, the Board further acknowledged "Respondent's claims that [Cathy Todd] mistreated patients, if true, would certainly furnish ample grounds for discharge" (A19 Fn. 5). Despite this statement, the Board found Todd was discharged for union activity. The Board's decision misapplies *Wright Line* and is not supported by substantial evidence.

**<u>Relevant Facts</u>**

Cathy Todd was a Nurse at Northeast Center until her termination in November 2019.  A135; 981; 536.

37

### Todd Had Training on Avoiding Mistreatment of Patients

Employees at Northeast received required training on abuse prevention annually.  A236; 499.  Verbal abuse is defined as "the use of oral, written or gestured language that willfully includes disparaging and derogatory terms to residents or their families or within their hearing distance, regardless of their age, ability to comprehend, or disability." A517.  Mental abuse is defined as: "verbal or nonverbal conduct which causes or has the potential to cause the resident to experience humiliation, intimidation, fear, shame, agitation, or degradation." A519.  Todd agreed it was not acceptable to yell at a patient or to swear at a patient. A160.  Todd admitted there were patients on her floor who had anxiety around food and were messy eaters, but that it was not acceptable to take food away because the person was a messy eater. A160.  Todd agreed it was not acceptable for a nurse to makes fun of the way a patient ate. A161.

### Todd Knew Her Medication Administration Obligations

The facility has a policy for administration times of medication.  A161; 238; 504. The policy permits medications to be given one hour before and one hour after the time ordered in the chart. A161; 504.

The facility has a Medications Self-Administration Policy that governs patients who are able to self-administer medications. A501; 237. It provides that if a patient did not come to the desk for their medications, the nurse would go to the

38

room and prompt them to come to the medication cart. A312. If the patient still did

not come, or if the patient requested, the nurse would need to bring medications to

the patient. A313.

Todd acknowledged that the nurse controlled who got medications and

when. A159; 162.  She further agreed that if a patient did not come to the desk for

any reason, the LP was still responsible to give patient medication. A161.

### Todd Was Counseled for Her Treatment of Patients

Cynthia Pope was the Unit Manager on floor NPR-4 and Todd's supervisor.

A267. In 2018, Pope had concerns about how Todd was treating a patient. Pope

held a mediation with the social worker, Todd and the patient to try to improve the

situation. Todd became very angry, and the patient had to be transferred off of the

floor because of Todd. A268.

In June 2019, Pope met with Todd to review her evaluation. Pope noted

concerns about Todd's attitude, her explosiveness and anger. A163; 269-70; 888.

Todd spoke loudly to Pope; she slammed her arms down, took the review and left.

A271; 278.

In early October 2019, Pope again met with Todd about her behavior after

Pope heard Todd yell at a patient to sit in a chair and not move. Pope told Todd she

could not restrict the movement of a patient. Todd became angry and walked out of

the meeting. Pope had a write up for Todd, but was not able to give it to her because Todd was so angry. A271-72.

### A Certified Nurses Aid Complaint about Todd's Behavior Toward Patients

In mid-November 2019, Pope observed an interaction at the nurses' station involving Todd and Certified Nurses Aid Sheranique Lewinson that gave her concern. Pope pulled Lewinson aside and asked her what was going on. Lewinson told Pope about a number of concerns she had with Todd and Todd's treatment of patients. A273-74. Pope asked Lewinson to make a written statement, which she did. A273-74; 418; 261-62. Pope provided the statement to new Director of Nursing Carchidi. A275; 228; 418. On November 12, Weir received the complaint from Carchidi and immediately directed an investigation. A228; 418.

### The Facility's Initial Investigation Before Suspending Todd

Before taking any action, Business Manager Julie Cole and Director of Nursing Carchidi interviewed the two patients referenced in Lewinson's complaint. Cole, who is also a Certified Nurses Aid, was chosen for the interview because of her existing relationship with the two patients. A369.

Patient J reported that Todd had been withholding food from her; and that Todd was aggressive when speaking to her. A369. Because of her brain injury, J had difficulty eating and would spit while she ate. Todd took food away from J telling her she "didn't have fucking time for that." J was quite upset during the

40

interview. A369-70.  The patient apologized and indicated she would work on her

behavior so she would be allowed to eat. Cole tried to reassure her that she could

eat in accordance with her care plan regardless of her spitting. A370.

Patient R reported that Todd was withholding food from her if Todd felt she

wasn't behaving the way she should behave. A371. She also reported that she was

being prevented from making her evening phone calls to her family if she wasn't

behaving the way Todd wanted.  She had to sit in a chair by the nurses' station

while Todd allowed other patients to make phone calls in front of her or in place of

her. A371. R also stated that Todd would discuss patient behavior, diagnoses and

medications with other patients. A371.

Cole reported to Weir what she had learned, and that she believed it was

abuse under the New York Department of Health regulations.  She reported that

Todd should be immediately suspended. A372; 506; 308. Carchidi agreed. A305.

Cole ultimately advised Weir that it was her opinion that Todd should be

terminated because she had withheld basic human needs—food, medications, and

the right to talk to family from patients and it was abuse. A373.

### Todd's Interview and Suspension Pending Further Investigation

Weir and Carchidi called Todd together. A305; 230-31. Weir asked Todd

about the complaints they had received. A149-50; 306-07; 230-31. Todd denied all

of the allegations. A308; 231. Weir offered Todd the opportunity to come in and write a statement. Todd declined.  A231; 420; 308-10.

Following the call, Weir directed the social work department to conduct interviews of the patients on Todd's floor, and directed Carchidi to conduct interviews of the staff who worked with Todd.

**Interviews of Patients Confirmed Multiple Incidents of Mistreatment**

Social Workers at Northeast engage in assessment and advocacy for patient; investigations involving patients; and on-going support for patients. Because of their training and experience, they frequently interview patients at the facility for a variety of reasons including quarterly assessments of mood and memory; when there is potential mistreatment of the patient by another patient or by staff; and when there is an on-going court matter. A282; 285.

Each of the social workers took a basic form and asked the patients on their list the questions on the form. A282; 423.  The form asked questions that related to emotional or verbal abuse or intellectual abuse or neglect. A282. These types of forms were used any time the facility must do an investigations involving patients. A232; 233. Investigations like Todd's investigation were conducted on a regular basis. A234. Following the interviews, the social workers compiled their findings. A283-84. Their conclusion was that there was evidence that Todd withheld

treatment or care from some patients she did not like. A285. The information was provided to Weir and Carchidi.  A285-86.

### **Other Incidents of Patient Mistreatment by Todd Came to Light**

In addition to the interviews, Britton-Schrager, the social worker for floor NPR-4, also provided information to Carchidi about two prior incidents involving Todd. A285-86. One incident occurred on Valentine's Day 2019. Britton-Schrager heard a commotion coming from a patient.  When she investigated, she found the patient crying and tearing up her own art work.  Prior to this, the patient had been very proud of the art work. This patient was less than a week from discharge and did not normally act out. Britton-Schrager asked the resident what was going on. The Resident reported that she'd had an encounter with Todd that was embarrassing and she felt demeaned in front of her peers. A498.  At the time of the incident, Britton-Schrager took a statement from the Resident, put it in a note, and reported it to her supervisor who reported it to the former Director of Nursing. A281; 285; A498.

The second incident occurred in late October 2019. A280. The patient had gotten dressed for bed in a nightgown and did not want to come to the desk to get her medications on the mixed gender floor. She rang her bell and asked for them. Todd told her that she should have known to get her medication first. Todd refused to bring her the medication and told her it would be documented as a refusal.

43

A280; 497.  At the time of this incident, Britton-Schrager had reported it to the Director of Social Work who provided the information to the former Director of Nursing. A281.

### Staff interviews Confirmed Todd's Mistreatment of Patients

Carchidi and Pope spoke to the two Certified Nurses Aids who worked on the same shift and same unit as Todd. The Certified Nurses Aids confirmed the patient complaints. A311; 422; 231.

### Pope Learned of Medication Problems Caused by Todd

While Todd was suspended, Pope handled Todd's medication pass. During that time, Pope learned that Todd was not giving patients their medications at the appropriate time. A275-76. Pope also heard about other issues from the patients on the floor. A276. Pope made a subsequent statement about these issues and provided it to Weir. A276-77; 421.

### Termination

Weir and Carchidi met and reviewed the patient interviews, the staff interviews, and the information from Pope and Britton-Schrager. A418-96. The investigation showed issues with the treatment of patients, not giving them medications, withholding food, making fun of the way patients ate. A314. The investigation revealed a long history of mistreatment of the patients, medication

administration issues, violations of residents' rights regarding food, taking food away from patients, and denying patients their phone calls. A239.

They agreed Todd should be terminated. A239; 314.

### **Misapplication of *Wright Line***

In *MECO Corp. v. NLRB*, this Court held that a finding that employees "had been conspicuous supporters of the Union is not sufficient to satisfy the first part of the *Wright Line* test." 986 F.2d 1434, 1437 (D.C. Cir. 1993). Instead, the Board was required to look to the "totality of the circumstances" surrounding the discharge. *Id.*

There was no evidence that Todd engaged in any union "activity" at the facility or anywhere else. The only evidence relied on by the Board in finding her alleged union activity was the motivation for her termination was that Todd spoke to supervisors Carchidi and Pope about the Union one time each in conversations both she and her supervisors described as innocuous;[13] and Weir had heard rumors that Todd supported the union. A241.

Compared to this very light evidence of union involvement by Todd, there was significant evidence of Todd's mistreatment of patients from numerous management and employee witnesses. Todd yelled at patients and restricted them

---

[13] Carchidi told Todd that educating herself was good, and Pope said nothing about the union.  A145 (Pope), A148 (Carchidi).

from moving (A271-72); withheld food; swore at patients; prevented patients from calling family; made fun of patients struggling to eat; and demeaned patients to the point of tears A285; 369; 371; A497-98.

The Board emphasizes Todd's twelve (12) years at the facility and the ALJ's incorrect conclusion that the allegation of patient mistreatment post-dated union activity. But Todd was counseled about treatment of patients numerous times before the final investigation, both before and after union activity began at the facility. A268 (Counseled regarding patient treatment in 2018); A888; 506-508 (Counseled in performance review regarding attitude, and explosiveness and anger toward patients and coworkers in June 2019); A271-72 (Counseled regarding yelling at patient in October 2019).

The Board's conclusion also ignores the many social worker complaints about Todd prior to the union activity that were simply ignored by the prior Director of Nursing. A281; 498 (February 2019 report of Todd demeaning patient to point she was in tears); A280; 497; 281; 285-86 (October 2019 refusal to provide medication to resident). These issues were confirmed by other employees on the floor. A311; 422; 231. The decision ignores the evidence that there was a change in the Director of Nursing to Carchidi who only learned about the years of complaints regarding Todd after she became Director of Nursing in late October 2019. A537.

46

The Board ignores the evidence that the investigation that led to Todd's termination was initiated by a complaint from a Certified Nursing Aid, not a management employee with animus (A273-74; 418; 261-62); and evidence that while Todd was suspended, her supervisor learned Todd was withholding medication from patients on a regular basis. A275-77; 421.

Finally, the Decision ignores the fact that Carchidi terminated other nurses for the similar behavior in the absence of union activity. A537; *Compare MEDCO*, 986 F.2d at 1437 (finding record did not have substantial evidence of union animus where other employees were treated similarly).

The Board got caught up in whether Todd should have been reported to New York State Department of Health. But this distinction ignores the fact that whether her behavior rose to the level of reportable abuse or not, it was still mistreatment of patients—and thus, as the Board itself said, worthy of termination.[14] The Board's decision lacks substantial evidence to support the General Counsel's burden of showing union animus toward Todd's behavior motivated the decision to terminate her.

---

[14] There was disagreement between Business Manager Cole who thought it should be reported and Administrator Weir who ultimately decided not to report it as abuse.  Weir testified that while it could have been abuse, it was a close call and he did not want to ruin Todd's nursing career.  He hoped she would learn from the termination and do better at her next job.

47

## Todd Was Terminated for Her Mistreatment of Patients

Even if the General Counsel had carried its burden of showing animus toward Todd, substantial evidence shows Todd was terminated for mistreatment of patients. Northeast Center conducted an extensive investigation before taking action against Todd, and reviewed her record as a whole. Simply put, Northeast Center could not continue to allow Todd to scream at brain injured patients, force them to sit in chairs because they were annoying, deny them contact with their family, deny them food because they struggled to eat, or withhold necessary medications. Todd's behavior was mistreatment of patients which, as the Board acknowledges is "ample grounds" for her termination.

## CONCLUSION

For the foregoing reasons, the Decision of the National Labor Relations Board should be overturned and the Court should dismiss the claim of uncharged surveillance and the claim that Golden was terminated in violation of the act. The Court should find that Endy was a statutory supervisor and as such, his termination was legal, or in the alternative that he was terminated for reasons other than union activity and should dismiss the claims. The Court should find the decision that Northeast Center terminated Cathy Todd for union activity is not supported by substantial evidence and should reverse the Board and dismiss the claim.

HINMAN, HOWARD & KATTELL, LLP


/s/ Dawn J. Lanouette
Dawn J. Lanouette, Esq.
*Attorneys for NCRNC, LLC d/b/a Northeast*
*Center for Rehabilitation and Brain Injury*
80 Exchange Street
PO Box 5250
Binghamton, NY 13902-5250
(607) 231-6917
dlanouette@hhk.com

49

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  _x_   The brief contains 10,458 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  _x_   The brief has been prepared in a proportionally spaced typeface using MS Word in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using MS Word 2002 in a ___ characters per inch_____ font.

HINMAN, HOWARD & KATTELL, LLP

/s/ Dawn J. Lanouette
Dawn J. Lanouette, Esq.
*Attorneys for NCRNC, LLC d/b/a Northeast Center for Rehabilitation and Brain Injury*
80 Exchange Street
PO Box 5250
Binghamton, NY 13902-5250
(607) 231-6917
dlanouette@hhk.com